**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**


GREGORY L. HOUSTON,         )
                                 )
         Plaintiff,         )
                                 )
v.                           )     Case No. 3:14-2050
                                 )     Judge Campbell/Bryant
PEPSICO, INC.,            )
                                 )
         Defendant.     )


To:    The Honorable Todd Campbell, District Judge


<u>REPORT AND RECOMMENDATION</u>


By order entered November 5, 2014 (Docket Entry No. 7), this matter was referred to the undersigned to hear and determine any pretrial issues and motions and to submit a report and recommendation for disposition of any motion filed under Fed. R. Civ. P. 12, 15, 56 and 65. Defendant filed a Motion for Summary Judgment on September 18, 2015 (Docket Entry No. 26). For the reasons given below, the undersigned recommends that Defendant's Motion for Summary Judgment be GRANTED.[1]


**I. Procedural History**

---

[1] It should be noted that the response brief of the Plaintiff includes a "Facts" section which introduces facts beyond those which were asserted by Defendant in its Statement of Undisputed Material Facts (Docket Entry No. 28), without an accompanying statement of additional disputed facts as contemplated by Local Rule 56.01(c). The fact that these new assertions are not highlighted as additional facts supporting the existence of a genuine issue for trial, and in fact have been individually identified as undisputed by Defendant (Docket Entry No. 37), underscores that they are improperly introduced in Plaintiff's narrative brief. Defendant seeks to have these additional facts stricken. (Docket Entry No. 37 at 1) Inasmuch as none of these additional facts are disputed for purposes of the instant motion, the undersigned would decline to strike them. However, Plaintiff's counsel is admonished to abide by the Local Rules.

On October 31, 2014, Defendant removed this case from the Circuit Court for Davidson County in Nashville to this Court on diversity grounds, pursuant to 28 U.S.C. §§ 1332 and 1441, noting that Plaintiff's state court complaint alleged an amount in controversy that easily exceeded the $75,000.00 jurisdictional minimum (Docket Entry No. 1). Plaintiff's state court complaint pled claims against Defendant PepsiCo, Inc. ("PepsiCo") exclusively under state law. (Docket Entry No. 1-1 at 4-5). However, in his Amended Complaint (Docket Entry No. 24), Plaintiff solely invokes this Court's federal question jurisdiction under 28 U.S.C. § 1331, and raises claims under federal law (a race discrimination claim and a retaliation claim, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e), in addition to pendent state law claims for violations of the Tennessee Human Rights Act, T.C.A. § 4-21-101, which were among the state law claims asserted in his original complaint.

## II. Factual Background

From the record before the Court, it appears that the following facts are undisputed, except as noted. On March 27, 2012, Defendant PepsiCo hired Plaintiff, a Caucasian male. PepsiCo's Nashville, Tennessee facility stores and delivers PepsiCo products to various customers, including local convenience and big-box stores and restaurants. Upon hire, Plaintiff mostly worked as a helper on a bay delivery truck. Upon hire, Plaintiff received the Bay Delivery Driver Role Guide ("Role Guide"), which details the duties of the Bay Delivery Driver ("drivers"). The Role Guide states that drivers are accountable for merchandising their accounts according to PepsiCo's "PREMIER" standards and that "failure to adhere to the Role Guide may result in discipline up to and including termination." The PREMIER standards require drivers to "merchandise" PepsiCo's products at customers' accounts after unloading the

product from trucks—i.e., stock products in store coolers and shelves, build displays, rotate stock and make the account look nice. Not all accounts require the same amount of merchandising. The volume of product PepsiCo drivers deliver varies and may double from a Monday to a Friday.

In the summer of 2012, Plaintiff became a Bay Delivery Driver with his own delivery route.[2] Bay Delivery Drivers deliver PepsiCo product to convenience stores, gas stations, and small grocery stores and unload the product from the truck into the account's premises. From summer 2012 through summer 2013, Plaintiff frequently delivered to Middle Tennessee State University ("MTSU") and various accounts in Murfreesboro. The amount of product that Plaintiff delivered declined sometimes when MTSU called its order in late, resulting in the order going out on another truck, or product being left off the truck. When MTSU was on summer break, PepsiCo assigned Plaintiff other accounts to fill out his route. Plaintiff's supervisors included Delivery Supervisor Tony Ricketts (African American) and Delivery Supervisor John Robinson (African American).

In Fall 2012, Plaintiff was driving with Bay Delivery Driver Chris Williams (who is African American) and observed him smoke what Plaintiff believed was a marijuana cigarette. Plaintiff told Sales Coordinator Rick Mitchell (Caucasian) that Williams smoked marijuana in the truck. Mitchell told Plaintiff he would take care of it. Plaintiff met with Robinson and Sales Operation Manager Ronnie Eason (Caucasian) the next day he came into work, and Eason asked

---

[2]     While Defendant's Statement of Facts states, and Plaintiff does not dispute, that "Plaintiff became a Bay Delivery Driver with his own delivery route," (Plaintiff's Response to Defendant's Statement of Facts, 4 (Docket Entry No. 33)) the parties dispute the existence of set territories or routes assigned to drivers. Defendant claims that drivers do not have a set territory, and that routes change based on fluctuations in order volume. Plaintiff, on the other hand, claims that he was assigned a set route.

Plaintiff to tell him in detail what happened with Williams.  Eason took notes of what Plaintiff said.  Eason contacted Human Resources Manager Carleen Cunio (Caucasian) about Plaintiff's report.  Cunio told Eason that he needed to send a supervisor out to observe Williams.  Robinson observed Williams a few times but did not see him smoke marijuana.  The parties disagree whether Eason and Mitchell took the situation "seriously."

In February or March 2013, Plaintiff told Cunio that the number of cases he delivered on his route had declined since he reported Williams for smoking marijuana.  At some point before speaking with Cunio, Plaintiff complained to Robinson that the number of cases he delivered on his route was down.  Robinson told Plaintiff that the number of cases he delivered was all that was ordered that day.  In May 2013, Plaintiff mailed an anonymous letter to several PepsiCo corporate addresses outlining certain concerns, including that drivers were being switched back and forth from hourly pay to commission without notification.  The letter also expressed concern that managers were threatening drivers with points and write-ups for minor infractions and that "employees are made to feel like going to upper management or Human Resources could cost you pay or cases on your route."  Human Resources Director Tom Smiley went to PepsiCo's Nashville facility to address the concerns raised in Plaintiff's anonymous letter.

In August 2013, when MTSU came back into session, PepsiCo split up the route that contained MTSU and assigned the stops to Bay Delivery Drivers Don Spivey (African American) and Marlin Sims (African American).  The parties disagree who decided to split up Plaintiff's route and reassign it, and why this decision was made.  The Defendant claims that

Plaintiff talked to Eason about his route being split up, and that Eason told Plaintiff that he was not going to pay commissions on a high volume account where drivers just dropped the product and did not merchandise it. However, Plaintiff claims that testimony was unclear regarding who decided to split up his route and assign it to Don Spivey and Marlin Sims, and that Ricketts and Robinson testified that they chose to change Plaintiff's route to decrease his stops.

After Defendant split up the MTSU route, it assigned Plaintiff to another route. The parties disagree whether the Plaintiff continued to receive commissions on the accounts he serviced on his new route. Defendant claims that he did; Plaintiff claims that while the new route PepsiCo assigned him had the potential to be paid through commissions, there were some occasions when he was paid through commissions and other times when he was paid hourly.

On September 6, 2013, Plaintiff and a helper made a delivery to St. Andrews Market, but did not stock the product or merchandise it. Plaintiff told the St. Andrews store employee that he was a member of "420 Union," was on strike, and was bringing the product in, but not putting it up. PepsiCo's Nashville facility is non-union and no employees were on strike at the time. Plaintiff claims that he was joking with the St. Andrews employee when he made these remarks. Plaintiff delivered product to the other stops on his route that day pursuant to the PREMIER standards. After leaving St. Andrews Market, Plaintiff called Robinson as well as Ken Harville, PepsiCo's "presalesman" for the St. Andrews account, and told them that he did not put the product up on the shelves.

On September 7, 2013, the St. Andrews Market manager called Robinson, upset about Plaintiff not putting the product in the coolers and on the shelves, and "belligerent" about

Plaintiff's union comments; the manager demanded that someone from Human Resources visit his store. The St. Andrews Market manager also called Harville, very angry. The manager complained to Harville that Plaintiff left 80 or 90 cases of product in the middle of the store and told the store employee that he could not put it up because he was union. Robinson contacted Cunio about the St. Andrews Market manager's complaint.

On September 19, 2013, Plaintiff met with Cunio, Ricketts, and Robinson. Cunio asked Plaintiff about his September 6, 2013 delivery to St. Andrews Market. Plaintiff explained that he was joking with the St. Andrews employee about being on strike and admitted that he did not put the product up. During the meeting, Plaintiff complained to Cunio that Ricketts and Robinson were smiling at each other. Cunio removed Ricketts and Robinson from the room. Cunio suspended Plaintiff pending her investigation. PepsiCo sent Sales Manager Ryan Cram and another employee to the St. Andrews store to speak with the store owner and attempt to convince the owner to readmit Plaintiff to the store. The store owner refused to let Plaintiff back into the store.

Defendant claims that Cunio and Eason decided to terminate Plaintiff for being permanently banned from a customer account; Plaintiff does not dispute that this is the proffered reason for Plaintiff's termination, but contends that this reason did not actually motivate the decision and was insufficient to do so.

In deciding to terminate Plaintiff, Cunio took into account the fact that Plaintiff had misrepresented to the customer that he was in a union and on strike. On September 24, 2013, Cunio and Eason called Plaintiff on the telephone and informed him of his termination.

PepsiCo also sent Plaintiff a letter outlining the reasons for his termination. On May 8, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission.

PepsiCo terminated former delivery drivers Charles Dodd (African American) on September 3, 2013 and Kevin Fleming (African American) on April 26, 2013 for being permanently banned from customer accounts. PepsiCo did not terminate delivery driver Chris Ledbetter (Caucasian) after a store asked PepsiCo to remove him from its account in July 2013 because the store manager eventually told Cunio that Ledbetter could return to the store and service the account. In the Summer of 2013, a store manager of one of PepsiCo's accounts, Debra Brymer, asked Robinson to remove driver Adonis Foster (African American) from her account because he did not stock product like he was supposed to. Brymer did not ask Robinson to contact Human Resources. Robinson left Foster on the account, although the parties dispute the reason (Plaintiff claims the reason was discrimination; Defendant claims it was due to driver complaints that this store manager was "nitpicky.")

### III. Conclusions of Law

### A. Standard of Review

To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); <u>Miller v. Calhoun County</u>, 408 F.3d 803, 811–12 (6th Cir. 2005). A "genuine issue of material fact" exists when the proof upon which that issue turns could induce a reasonable jury to return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986). The burden of establishing the

absence of a factual dispute rests with the moving party.  Id. at 250 n.4.

In deciding whether summary judgment is appropriate, the court "must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." Sowards v. Loudon County, 203 F.3d 426, 431 (6th Cir. 2000), cert. denied, 531 U.S. 875 (2000).  In so doing, the district court must "draw all reasonable inferences in favor of the nonmoving party" in its analysis of the affidavits and other submissions.  Sadie v. City of Cleveland, 718 F.3d 596, 599 (6th Cir. 2013) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## B. The Federal Title VII Claims

Defendant argues that Plaintiff's Title VII claims are time-barred, because he did not initially file a charge with the Tennessee Human Rights Commission (THRC).  This argument is persuasive.

Title VII requires that plaintiffs first exhaust their administrative remedies.  See El-Zabet v. Nissan N. Am., Inc., 211 F. App'x 460, 463 (6th Cir. 2006).  The statute provides that

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . . *except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency* with authority to grant or seek relief from such practice . . . such charge shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . . .

42 U.S.C. § 2000e-5(e)(1) (emphasis added).

In El-Zabet, the Sixth Circuit explained that "Title VII requires a party wishing

to contest an allegedly discriminatory act to file a charge with the EEOC within 300 days of the act, if the party 'initially instituted proceedings with a State or local agency' qualified to provide relief, or within 180 days, if the party did not do so." El-Zabet, 211 F. App'x at 463 (quoting § 2000e-5(e)(1)). The Court went on to find that the 180-day time limit applied, because "nothing in the record indicate[d] that [the plaintiff] instituted proceedings with a state or local agency," although "a state system of administrative remedies qualified to provide relief under Section 2000e-5(e)(1)" did exist. Id.

Likewise, in White v. Metro. Gov't of Nashville & Davidson Cty., No. 3:11-cv-0607, 2013 WL 269042 (M.D. Tenn. Jan. 24, 2013), the Court cited El-Zabet in ruling that the "default" 180-day limitation applied to a plaintiff with ADA claims "because [the plaintiff] never utilized the deferral process otherwise available in Tennessee." 2013 WL 269042, at *5. Mohasco Corp. v. Silver, 447 U.S. 807 (1980), cited by Plaintiff, is not to the contrary. In Mohasco, the Supreme Court held that while a plaintiff arguably "[u]nder the literal terms of the statute . . . did not bring himself within the exception to the general 180-day requirement" because he did not institute any state proceedings prior to writing to the EEOC, the action of the EEOC itself, in immediately instituting state proceedings on the plaintiff's behalf by forwarding his letter to the state agency, would satisfy the requirement of "initially institut[ing] with a State . . . agency" for purposes of the time limit exception. Id. at 816-17. The Supreme Court thus did not excuse the plaintiff's failure to file with the state, but found on the facts before it that the case fell within the 300-day exception because a state agency filing had been effectively made on the plaintiff's behalf. No such effective state filing has been made

here.

In the case at bar, Plaintiff was terminated from Pepsico on September 24, 2013. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on May 8, 2014 (226 days later). The record does not reflect (nor does Plaintiff argue) that Plaintiff filed a complaint with the appropriate state agency (the Tennessee Human Rights Commission) within 180 days of any of the events which he alleges violate Title VII, or at all. Thus, in accord with the foregoing precedent, Plaintiff is not entitled to the deferential extension of the EEOC filing deadline to 300 days. His Title VII claims are therefore time-barred, and Defendant is entitled to summary judgment as to both.

## C. The Tennessee Human Rights Act Claims

As mentioned in the description of this case's procedural history, supra at 2, Plaintiff's Amended Complaint invokes this Court's federal question jurisdiction only. In his motion to amend, Plaintiff states that "[t]he purpose of amending the original [state court] Complaint is to amend, correct and restate Plaintiff's averment and cause of action against Defendant[,]" to reflect its federal character. (Docket Entry No. 22 at 1). In light of this amendment, which also amends the *ad damnum* clause from the original complaint by not including any particular sum sought as damages (see Docket Entry No. 24 at 6-7), it appears that plaintiff's claims for violations of the Tennessee Human Rights Act fall within this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, inasmuch as they are so closely related to the federal claims as to form part of the same case or controversy. Defendant fully argues the

merits of these state law claims (albeit under the assumption that plaintiff's Title VII claims are deemed timely (Docket Entry No. 27 at 8)) by addressing its arguments to Plaintiff's "termination claims," "retaliation claims," et cetera. Should the Court determine, as recommended, that all federal claims are time-barred and should be dismissed, the undersigned nonetheless finds that it is appropriate to retain jurisdiction over the state claims. While there is a general presumption that dismissal of all federal claims should result in declining to retain supplemental jurisdiction over pendent state claims, this presumption is weakened where the dismissal of the touchstone federal claims is not pursuant to motion under Fed. R. Civ. P. 12(b)(1) or (6), but is pursuant to a Rule 56 summary judgment motion. See Musson Theatrical, Inc. v. Federal Exp. Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996). Moreover, retention of jurisdiction is indicated by the circumstances of this particular case, which was originally removed based on diversity jurisdiction, and which still involves parties of diverse citizenship and an amount in controversy that is not definitively below the jurisdictional minimum. Finally, the nature of the state law claims (identical in every material respect to the federal claims asserted here), the character of the governing state law (its stated purpose being to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts," Tenn. Code Ann. § 4-21-101(a)(1)), and the relationship between the state and federal claims (parallel tracks to remedies that are similar but not wholly duplicative) all support the exercise of jurisdiction in this case. See City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 173 (1997). Accordingly, the following analysis of the merits of plaintiff's state law claims is offered.

Generally, "THRA claims are analyzed in the same manner as Title VII claims. As the Tennessee Supreme Court has noted, '. . . it is clear that the [Tennessee] legislature intended the THRA to be coextensive with federal law. [Courts], therefore, may look to federal interpretation of Title VII for guidance in enforcing [Tennessee's] anti-discrimination statute.'" Williams v. The City of Milan, Tenn., No. 1:08-CV-01235, 2009 WL 989775, at *2 (W.D. Tenn. Apr. 8, 2009) (internal citation omitted).

Plaintiffs alleging violations of Title VII "may prove [their] claim[s] using either direct or circumstantial evidence. Where a plaintiff relies on circumstantial evidence, courts typically apply the three-part burden-shifting framework developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment." Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 775 (6th Cir. 2016) (internal citation omitted).

As the Sixth Circuit describes this burden-shifting approach,

> a plaintiff must first set forth a prima facie case of discrimination. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. If the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. The ultimate burden of persuasion remains at all times with the plaintiff.

Arendale v. City of Memphis, 519 F.3d 587, 603 (6th Cir. 2008) (quoting Newman v. Fed. Express Corp., 266 F.3d 401, 405 (6th Cir. 2001)).

The elements of the prima facie case are that:

> 1) [the plaintiff] is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.

Id.

Even within the context of this burden-shifting framework, the Sixth Circuit has made clear that "the plaintiff's burden at the prima facie stage is not onerous and poses a burden easily met." VHS Detroit Receiving Hosp., Inc., 814 F.3d at 776 (internal citations omitted).

## Plaintiff's Prima Facie Case

### i)  Protected Class/Discrimination Against the Majority

In order for a plaintiff who has majority status to show that he was discriminated against, the first prong of the prima facie case is modified such that he must demonstrate "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" Arendale, 519 F.3d at 603 (internal citation omitted). These background circumstances are shown "by producing evidence that defendant's unlawful consideration of race in the past 'justifies the suspicion that incidents of capricious discrimination against whites because of their race may be likely.' Such 'circumstances' can be established by proof of internal or external pressure to favor minorities . . . [as well as] the

hiring or promoting employee's membership in the same minority race as the employees he or she was purportedly favoring . . . . Courts also consider the racial composition of the relevant workforce, management, and decisionmakers." Atkins v. Denso Mfg. Tenn., No. 3:09-CV-520, 2011 WL 5023392, at *5 (E.D. Tenn. Oct. 20, 2011) (internal citations omitted).

Houston argues that his report of an African-American driver for smoking marijuana on the job was "completely discounted"; that the driver was not drug-tested or disciplined, but given a driving award, only to be terminated later for failing a random drug test;[3] and that these facts show "potential internal pressure to favor minorities." (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 32 at 13). However, the record evidence does not support the claim that PepsiCo "completely discounted" Houston's report. Rather, the deposition testimony along with Plaintiff's Response to Defendant's Statement of Facts show that PepsiCo made at least some investigation, and that Plaintiff felt that at least one person took his report seriously.

Houston also argues that because the two decision makers whom he alleges subjected him to disparate treatment and retaliated against him (Robinson and Ricketts) are both African-American, this constitutes a "building block to establish that Mr. Houston was being discriminated against by them because of his race." Plaintiff's Response, 12-13. While the supervisors who later fired him were white, Plaintiff alleges that they were involved in the

---

[3] PepsiCo in its Response to Plaintiff's Statement of Facts does not dispute that the driver was later terminated for failing a random drug test. (Defendant's Response to Plaintiff's Statement of Facts ("Response to Facts"), Docket Entry No. 37 at 7). Further, while in its Response to Facts Defendant asserts that the Court should not consider the fact that the driver did not receive a drug test in response to Plaintiff's report because that fact is not supported by the record evidence cited by Plaintiff, id., Defendant makes clear that for purposes of its summary judgment motion, it does not dispute any of the facts put forward by Plaintiff. Id. at 2; see also Docket Entry No. 36 at 1.

allegedly discriminatory investigation of the marijuana incident.  He makes similar arguments concerning the decision to remove certain stops from his route (or "split up" the route, though the parties dispute whether Houston in fact had a route and whether that route was split up), alleging that the record is unclear, but contains some evidence supporting the conclusion that Robinson and Ricketts made that decision.

PepsiCo argues that because the two PepsiCo employees who made the decision to terminate Plaintiff's employment are both Caucasian, this fact "bel[ies] any inference of discrimination against Plaintiff because of his white race."  (Defendant's Memorandum in Support of its Motion for Summary Judgment ("Defendant's Memorandum") Docket Entry No. 27 at 9).  In support of its argument, PepsiCo cites two cases, <u>Ford v. Chad Youth Enhancement Ctr.</u>, No. 3:08-cv-635, 2010 WL 1177334 (M.D. Tenn. Mar. 24, 2010), and <u>Johnson v. Metro. Gov't of Nashville & Davidson Cty.</u>, No. 3:07-0979, 2010 WL 3342211 (M.D. Tenn. Aug. 24, 2010).  However, neither case, particularly when read in the light of <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75 (1998), supports the proposition that because the supervisors who fired Houston are white, it is automatically unreasonable to draw an inference that he was discriminated against because of his race.

In <u>Ford</u>, this Court distinguished the facts of the case before it from earlier cases (one case in which the supervisors at issue were African American, and another in which all of the decision makers in the claim were African American), noting that in the case before it, a Hispanic employee oversaw hiring and shift assignments, and the decision makers in management included both Caucasian and African American members.  <u>Ford</u>, 2010 WL

1177334, at *10.  In so doing, the Court did not state a conclusive rule that the presence of

Caucasian decision makers will preclude a Caucasian plaintiff from establishing the first prong

of his prima facie case.  The facts in <u>Ford</u> are distinguishable from the present facts, because the

presence of members of three races among the decision makers constitutes stronger evidence

against any suspicion that the employer discriminates against anyone - minority or majority - on

the basis of race.  Here, by contrast, the decision makers are either all African American, or half

of them are (depending on which decision is examined).

  <u>Johnson</u> presents an even more distinct set of facts.  In <u>Johnson</u>, the white male

plaintiffs could not show background circumstances supporting a suspicion of discrimination

against the majority, where the *sole* decision maker was himself a white male who had promoted

mostly white male officers during the year the plaintiffs claimed he discriminated against them.

<u>Johnson</u>, 2010 WL 3342211, at *15.  Based on this factual distinction, the court found  that

precedent involving an all-African American set of decision makers was inapplicable.  <u>Id.</u>

<u>Johnson</u> is not relevant to the issues at hand, because that case involved a single decision maker

of the same race as the Caucasian plaintiff, not the presence of both Caucasian and African

American individuals among a group of decision makers.

  Furthermore, in <u>Oncale</u>, the Supreme Court explained that it has "rejected any

*conclusive presumption* that an employer will not discriminate against members of his own

race." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998) (citing <u>Castaneda v.</u>

<u>Partida</u>, 430 U.S. 482, 499 (1977)) (emphasis added). The Court explained that "'[b]ecause of

the many facets of human motivation, it would be unwise to presume as a matter of law that

human beings of one definable group will not discriminate against other members of their group.'" Id. (quoting Castaneda).

Viewed in the light most favorable to the Plaintiff, and bearing in mind the guiding principle that Plaintiff's burden in proving his prima facie case is "not onerous," the evidence could permit a reasonable jury to find that PepsiCo is that rare employer who discriminates against the majority, making Houston a member of a protected class. VHS Detroit Receiving Hosp., Inc., 814 F.3d at 776.

### ii)     Qualified for the Job

The record reflects no dispute between the parties that Houston was qualified for the job he held at PepsiCo, and neither party briefed this issue. The undersigned therefore concludes it is an undisputed fact that Houston was so qualified.

### iii)     Adverse Employment Decision

### 1. Termination

The record reflects no dispute between the parties that Houston's termination constituted an adverse employment action, and neither party briefed this issue. The undersigned therefore concludes that it is an undisputed fact that Houston suffered an adverse employment decision when PepsiCo fired him.

## 2. Other Prior Adverse Employment Actions

Houston claims that changes in his "route distribution and case count" constituted additional adverse employment actions. Plaintiff's Response, p. 15. He claims that PepsiCo changed his route (as noted, a fact that the parties vigorously dispute), which led to Houston delivering less Pepsi product, and thus to being paid less. However, as PepsiCo points out, Houston failed to point to "any record evidence showing that the amount of product Plaintiff delivered or his pay was reduced in any way." Defendant's Memorandum, 13. Notably, while record evidence (Plaintiff's own deposition testimony) does exist to show that the amount of **product** that Plaintiff delivered dropped dramatically, no evidence exists to show that Plaintiff's **pay** actually dropped. Plaintiff points to deposition testimony that "[I]f you have a lot of cases, it's possible that you could earn more money than if somebody had a lower number of cases." Plaintiff's Response, 16; Deposition of John Robinson 55:1-6 (Docket Entry No. 29 Ex. 4). However, the most that this statement establishes is that it is *possible* that Plaintiff suffered a loss of pay. Plaintiff provides no other evidence to support a finding that he suffered an adverse employment action as a result of his route allegedly being broken up and his case count consequently reduced.

Neither does Plaintiff's argument that "no evidence established whether his commissions were the same" in any way establish an adverse employment action. Plaintiff's Response, 16. Plaintiff's job under the applicable burden-shifting framework is to establish affirmatively a prima facie case. While this burden is "not onerous," see Burdine, 450 U.S. at 253, Plaintiff's responsibility is not fulfilled by explaining that there is no evidence either way

about a matter, particularly when the matter in question is something about which Plaintiff should have personal knowledge.

The undersigned therefore concludes that Houston has failed to establish that these actions - as distinct from the termination action - were adverse employment actions. Thus, Plaintiff has failed to establish a prima facie case of discrimination as to these actions, and the Defendant is entitled to Summary Judgment as to Plaintiff's THRA claims based on them. For that reason, the undersigned does not reach the issues of whether similarly situated employees were treated differently in regard to *these* actions, or whether the Defendant's proffered reason for any such treatment was pretextual.

iv) **Similarly Situated Employees Treated Differently**

As the Sixth Circuit has explained, in order to find "two individuals to be similarly-situated in a disciplinary context. . . . the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances which would distinguish their conduct or the employer's treatment of them for that conduct." Conti v. Universal Enterprises, Inc., 50 F. App'x 690, 699 (6th Cir. Sept. 20, 2002).

The Plaintiff has not presented evidence to enable a reasonable jury to find that Houston and his proffered comparator (Adonis Foster) were similarly situated, because he has

offered no evidence whatsoever that they dealt with the same supervisor and were subject to the same standards. Plaintiff's Response does not address the latter issue at all, and as to the former, merely states that "the record does not establish whether these individuals were subject to the same decision-makers for their termination or their day-to-day direct supervisors. Therefore, an issue of fact exists and the inquiry must not end there." Plaintiff's Response, 14.

This statement again misapprehends both the nature of the material, triable issue which Plaintiff must demonstrate, and the Plaintiff's responsibility under the burden-shifting framework. The argument that a genuine issue of material fact exists, and summary judgment for the Defendant must be defeated, *because* there is no evidence either way (not even a scintilla) must fail under well-established procedural law. <u>Anderson</u>, 477 U.S. 242, 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff"). Even if this were not so, and as explained above, the Title VII burden-shifting framework places the initial burden on the *Plaintiff* to prove affirmatively his prima facie case, and pointing to a lack of evidence does not advance Plaintiff's prima facie case whatsoever.

Because of this, the undersigned does not reach the question of whether Houston and Foster engaged in the same conduct without differentiating or mitigating circumstances to distinguish that conduct or the employer's treatment of them for it. The undersigned concludes that Plaintiff has not met his burden of showing a prima facie case of discrimination as to any of the adverse employment actions alleged, and the Defendant is entitled to summary judgment on Plaintiff's THRA termination claim.

**The THRA Retaliation Claim**

The elements of the prima facie case for a retaliation claim are that

> (1) [the plaintiff] engaged in activity protected under [the statute]; (2) the defendant knew that [he] engaged in protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected.

DeJesus v. Geren, No. 3:08CV0043, 2008 WL 2558009, at *17 (M.D. Tenn. June 23, 2008) (internal citations omitted).

Importantly, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotations omitted). Mere personality conflicts at work that generate "antipathy" and "'snubbing' by supervisors and co-workers" do not qualify as materially adverse action which might dissuade a reasonable worker from making a charge of discrimination. Id. Under normal circumstances, neither will "petty slights, minor annoyances, and simple lack of good manners." Id.

### i) Protected Activity

The Sixth Circuit is clear that the statutorily protected activity under Title VII (and thus, the THRA) includes complaints to human resources personnel as well as "complaints

to management and less formal protests of discriminatory employment practices." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014), reh'g denied (Apr. 2, 2014); see also Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc., 495 Fed.Appx. 651, 655 (6th Cir. Aug. 20, 2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation."). On the other hand, there does not appear to be any support whatsoever (and Plaintiff does not provide any) for the proposition that reporting another employee's on-the-job drug use constitutes a protected act under either federal or state law.

Plaintiff cites to record evidence that he repeatedly complained to PepsiCo's Human Resources department, to his direct supervisors, and by anonymous letter to the company, that he felt he was subject to discriminatory treatment. Plaintiff's Response, 18. The undersigned concludes that Houston's complaints constituted statutorily protected activity under the THRA, but that his report regarding his co-worker's alleged marijuana use did not.

### ii) Employer Awareness of Protected Activity

Because Houston communicated his complaints of discrimination directly with Human Resources personnel and sent a letter directly to the company, PepsiCo was aware of Houston's protected activity.

### iii) Adverse Employment Action/Severe or Pervasive Harassment by a Supervisor

In his Response, Plaintiff claims that the following actions occurred, constituting adverse employment actions which a reasonable jury could conclude would dissuade a reasonable worker from making charges of discrimination:

- "[Plaintiff's] supervisor Tony Ricketts told him not to call Ricketts on his personal cell phone only after [Plaintiff] reported the marijuana use of an African-American driver. (Pl. Dep. 135:19–138:19.)"

- "Ricketts swore at Plaintiff because Plaintiff did not return a key to pallet jacks despite the fact that Eason gave the key to [Plaintiff]. (Pl. Dep. 109:2–111:16.)"

- "In February 2013, Plaintiff's supervisor John Robinson assigned Plaintiff a point under the attendance policy when Plaintiff called in sick. (Pl. Dep. 127:14–129:13.)"

- "Ricketts stood by the time clock frequently when Plaintiff walked in for his shift and told him that he would have assessed Plaintiff a point if Plaintiff had been late. (Pl. Dep. 128:13–129:5.)"

- "Ricketts asked Delivery Driver L'Cretia Walker to ride with Plaintiff and report back to him everything that happened. (Pl. Dep. 127:14–129:13.)"

- "Robinson and Ricketts did not provide Plaintiff a helper and made him drive when he was out of DOT hours. (Pl. Dep. 140:10–144:8)"

- "Eason, Robinson, and Ricketts hung up on Plaintiff numerous times when he was on his route or did not answer his phone calls. (Pl. Dep. 149:17–150:18.)"

These actions, to the extent they were improper, reflect the type of "petty slights, minor annoyances, and simple lack of good manners" which - however unseemly - do not constitute materially adverse employment action or severe and pervasive harassment.  Burlington

N. & Santa Fe Ry. Co. 548 U.S. at 68.  The undersigned further finds that these actions do not qualify as "severe or pervasive retaliatory harassment by a supervisor," although Plaintiff did not explicitly argue that they did.  Accordingly, Plaintiff's THRA retaliation claim must fail for lack of sufficient harm to him.

### iv) Causal connection

Even if Houston did suffer an adverse employment action or severe and pervasive harassment by a supervisor after engaging in statutorily protected activity, there is no evidence of a causal connection between the two.

First, the only evidence that Plaintiff offers of a causal connection is the temporal proximity between his allegedly protected activity and Defendant's allegedly retaliatory action. However, there is insufficient proximity (nine or ten months, depending on which action is examined) to infer causation.  Standing alone and absent some further showing, this proximity does not suffice to prove causation, as "[t]he Sixth Circuit has adhered to the rule that an interval of more than six months between the adverse action and the protected activity will not, by itself, establish a causal connection."  Evans v. Prospect Airport Servs., No. 3:05-0368, 2007 WL 509078, at *5 (M.D. Tenn. Feb. 13, 2007) (citing Lentz v. City of Cleveland, 410 F. Supp. 2d 673, 691 (N.D. Ohio 2006) ("anything over six months is generally insufficient, standing alone, to establish a causal connection")); see also Sanchez v. Caldera, 36 Fed. Appx. 844, 846 (6th Cir. June 11, 2002) (less than six months generally required to infer causation).

Second, as PepsiCo points out, there can be no causal relationship between Plaintiff's protected activity and the alleged retaliatory action, because Plaintiff's own testimony

ties these actions to the marijuana reporting incident, not to his complaints of discrimination. Defendant's Memorandum, 12.

For these reasons, even assuming for the sake of argument that Plaintiff suffered adverse action in the form of the above-enumerated incidents, there is no evidence which would permit a reasonable jury to find causation between any such harassment and his reports of discrimination.

## D. No Hostile Work Environment Claim

No hostile work environment claim is addressed, because the Plaintiff specifically disavows any such claim. Plaintiff's Response, 2 n.1.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that the Motion for Summary Judgment be GRANTED as to all claims.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 6th day of May, 2016.

s/ John S. Bryant

JOHN S. BRYANT

UNITED STATES MAGISTRATE JUDGE